2007-NMSC-034

161 P.3d 883

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Richard G. KIRBY, Defendant–Petitioner.**

No. 29,257.

Supreme Court of New Mexico.

June 13, 2007.

John Bigelow, Chief Public Defender William A. O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Gary K. King, Attorney General Ann M. Harvey, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} An independent website designer creates a website on the internet under contract with a business seeking to use the website for commercial purposes. In breach of the contract, the website designer is never paid and is locked out from access to the website. Under these circumstances, may the person who hired the website designer be convicted of criminal fraud, defined as obtaining a website belonging to "someone other than the defendant?" We inquire as to who is the owner of the website under these circumstances, the website designer or the person who hires the designer and for whom the website is developed. We hold that, in most circumstances, unless expressly agreed otherwise, it is the creator of the web pages that are displayed on such sites. In so holding, we affirm the Court of Appeals and the verdict below.

## BACKGROUND

{2} Defendant Kirby owned a small business, Global Exchange Holding, LLC. As part of his business venture, Defendant hired Loren Collett, a sole proprietor operating under the name Starvation Graphics Compa-

ny, to design and develop a website. The two entered into a website design contract. As part of the contract, Defendant agreed to pay Collett $1,890.00, plus tax, for his services.

{3} Collett then developed and designed the web pages and incorporated them into the website, but he was never paid. When Defendant changed the password and locked Collett out from the website, Defendant was charged with one count of fraud over $250 but less than $2,500, a fourth degree felony. NMSA 1978, § 30–16–6 (as amended through 1987). The criminal complaint alleged that Defendant took "a Website Design belonging to Loren Collett, by means of fraudulent conduct, practices, or representations."

{4} At trial Defendant focused primarily on refuting any intent to defraud Collett. On appeal, however, he challenges the sufficiency of the evidence that Collett was the actual owner of the website, an element required under the fraud statute. *See* § 30–16–6; UJI 14–1640 NMRA. In effect, Defendant takes the position that he, not Collett, owned the website, and therefore, he could not defraud himself. The jury was instructed that to find Defendant guilty the State had to prove beyond a reasonable doubt that (1) Defendant intended to "deceive or cheat" Collett, (2) Defendant had "obtained a web site," and (3) the *"web site belonged to someone other than the defendant."* (Emphasis added.) *See* UJI 14–1640. In a Memorandum Opinion the Court of Appeals affirmed Defendant's conviction. *State v. Kirby,* No. 24,845 (N.M.Ct.App. May 10, 2005). We granted certiorari to address the issue of who is the owner of a website under these circumstances: the designer or the person who hires the designer.

## DISCUSSION

### Standard of Review

■ {5} Defendant asserts that no "rational jury could have found each element of the crime to be established beyond a reasonable doubt," and in particular that the website *belonged* to someone else. *State v. Garcia,* 114 N.M. 269, 273–74, 837 P.2d 862, 866–67 (1992) (discussing the substantial evidence standard of review). Accordingly, we inquire whether substantial evidence establishes that

Collett, and not Defendant, owned the website. To make this determination, however, we must first address "ownership" in the unfamiliar context of the internet. That, in turn, is a question of law which we review de novo. *Hasse Contracting Co. v. KBK Fin., Inc.,* 1999–NMSC–023, ¶ 9, 127 N.M. 316, 980 P.2d 641. Thus, to answer the question presented on certiorari, we first address ownership in the website context, then turn to the evidence to determine whether someone other than Defendant owned the website.

## Ownership of the Website

■ {6} Because of the internet's technical nature, we take a moment to provide some general background information on this "unique and wholly new medium of worldwide human communication." *Reno v. ACLU,* 521 U.S. 844, 850, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (quoted authority omitted). As noted by our Court of Appeals in *Sublett v. Wallin,* "[t]he internet is 'an international network of interconnected computers' that allows users to access a massive amount of information by connecting to a host computer." 2004–NMCA–089, ¶ 24, 136 N.M. 102, 94 P.3d 845 (quoting *Reno,* 521 U.S. at 849–50, 117 S.Ct. 2329). A website is "[a] set of interconnected webpages, usually including a homepage, generally located on the same server, and prepared and maintained as a collection of information by a person, group, or organization." *The American Heritage Dictionary of the English Language* 1949 (4th ed.2000) [hereinafter *American Heritage*]; *see also Sublett,* 2004–NMCA–089, ¶ 24, 136 N.M. 102, 94 P.3d 845 (stating that "[a] 'website' consists of any number of web pages with a unique 'address' that allows users to locate it" (quoted authority omitted)). Thus, a web page is an integral part of a website. A web page is further defined as "[a] document on the World Wide Web, consisting of an HTML file and any related files for scripts and graphics, and often hyperlinked to other documents on the Web." *American Heritage, supra,* at 1949.

{7} The Court of Appeals held in this appeal that the jury had sufficient evidence to find that Defendant did not own the website, and therefore, had obtained property

belonging to someone else by fraud. *Kirby*, No. 24,845, slip op. at 2–3. Explaining its decision, the Court of Appeals emphasized that because a "website includes the web pages," and Defendant never paid Collett for the web pages as contractually agreed, ownership remained with someone other than Defendant. *Id.* We agree with that reasoning as far as it goes, but determine that further analysis may assist the bar and the public in better understanding this complex and novel area of the law. *See Sublett*, 2004–NMCA–089, ¶ 24, 136 N.M. 102, 94 P.3d 845 (noting how few opportunities the courts of this state have had to address the internet in a legal context).

{8} We first turn our attention to the legal document governing the agreement between Collett and Defendant, the "Website Design Contract." According to that contract, Collett was engaged "for the specific project of developing and/or improving a World Wide Website to be installed on the client's web space on a web hosting service's computer." Thus, the end product of Collett's work was the website, and the client, Defendant, owned the web space. Defendant was to "select a web hosting service" which would allow Collett access to the website. Collett was to develop the website from content supplied by Defendant.

{9} While the contract did not explicitly state who owned the website, it did specify ownership of the copyright to the web pages. "Copyright to the finished assembled work of web pages" was owned by Collett, and upon final payment Defendant would be "assigned rights to use as a website the design, graphics, and text contained in the finished assembled website." Collett reserved the right to remove web pages from the Internet until final payment was made. Thus, the contract

makes clear that Collett was, and would remain, the owner of the copyright to the web pages making up the website. Upon payment, Defendant would receive a kind of license to use the website.

{10} This contract is consistent with general copyright principles, under which copyright ownership likely would have rested with Collett even if no contractual agreement had existed. *See* Rinaldo Del Gallo, III, *Who Owns the Web Site?: The Ultimate Question When a Hiring Party Has a Falling–Out with the Web Site Designer*, 16 J. Marshall J. Computer & Info. L. 857, 895 (1998) ("Copyright [of a website] vests initially in the author. Therefore, absent a subsequent agreement to the contrary, the hiring party has no ownership right in the copyright."). The United States Copyright Act discusses ownership of authored works, such as web pages. Under that Act, copyright ownership of a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a) (2000); *see also Attig v. DRG, Inc.*, No. Civ. A. 04–CV–3740, 2005 WL 730681, at *4 (E.D.Pa. Mar.30, 2005) (discussing how the general rule under the Copyright Act is that ownership of the copyright to a website rests with the web designer as the "author" of the work); *Kantemirov v. Goldine*, No. C05–01362 HRL, 2005 WL 1593533, at *4 (N.D.Cal. June 29, 2005) ("Neither party has cited, and the court has not found, authority holding that website design … fall[s] within the subject matter of the Copyright Act. Nonetheless, … [g]iven the flexible definition of works falling with [sic] the scope of the Copyright Act, … website design and layout … falls within the general subject matter of the … Act.").

■ {11} Thus, the creator of the work owns the copyright to that work.[1] This is

---

1. There are exceptions to the general rule that the author of the work is the sole copyright owner. First, the creator of the work may not be the copyright owner in a "work made for hire" arrangement. 17 U.S.C. § 201(b) (2000); Del Gallo, *supra*, at 871–72. Under the Act there are two sets of circumstances that lead to a work being made for hire. First, the work can be "prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); *see also Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d

811 (1989) (stating the factors to utilize under the common law of agency to determine if a hired party is an employee thereby falling under Section 101(1) of the Copyright Act). Neither party argues that Collett was an employee rather than an independent contract under this exception. The second work for hire exception applies to the independent contractor scenario, as exists here. 17 U.S.C. § 101(2). To apply in the independent contractor context, the parties must expressly agree in a signed written instrument that the work will be work for hire and the work must

true even if the work created by the author is an expression of another's view of the ultimate work product. *Cf. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (stating that the originality requirement necessary to copyright material merely requires a "minimal degree of creativity"). Here, Collett was the "author" of the web pages, and accordingly, he owned the copyright to those web pages.

{12} Defendant does not dispute this proposition. In his brief to this Court, Defendant concedes that the website "contained copyright material that belonged to Loren Collett." However, he contends that Collett's ownership of the copyright is separate from ownership of the website. Thus, because the contract only specified ownership of the copyright interest in the web pages and not ownership of the website, Defendant asserts that from the very beginning he and not Collett owned the website. Therefore, no rational jury could have found, as an essential element of the crime charged, that the "web site belonged to someone other than the defendant." *See* UJI 14–1640.

{13} Specifically, Defendant argues that because he owned certain elements that are part of a website and help make it functional, he was the website owner regardless of who owned the copyright to the web pages. Specifically, Defendant purchased a "domain name" for the website and had contracted with an internet hosting service for "storage" of that website. This same hosting service was the platform from which the website was to be displayed on the internet. Defendant, as the owner of the domain name and storage service, also owned the password that enabled him to "admit or exclude" other people from the website. As we have seen, Defendant excluded Collett from the website after Collett, seeking payment for his work, threatened to pull the web pages from the site. Defendant argues that his control of the password, ownership of the domain name,

and contract with an internet hosting service provider gave him ownership of the web site.

{14} While a domain name, service provider, and password are all necessary components of a website, none of them rises to the importance of the web pages that provide content to the website. A domain name is also referred to as a domain address. 3 Steven D. Imparl, *Internet Law: The Complete Guide* II–4–1 (2006). A domain address is similar to a street address, "in that it is through this domain address that Internet users find one another." *Inset Sys., Inc. v. Instruction Set, Inc.*, 937 F.Supp. 161, 163 (D.Conn.1996). But it is nothing more than an address. 3 *Internet Law, supra*, at II–4–1. If a company owned a domain name or address but had no web pages to display, then upon the address being typed into a computer, only a blank page would appear. A blank web page is of little use to any business enterprise. It is the information to be displayed on that web page that creates substance and value. Similarly, the service provider only stores that information on the web pages and relays that communication to others. *See Reno*, 521 U.S. at 850, 117 S.Ct. 2329. Having a service provider meant little to Defendant if the web pages were blank. Thus, the predominant part of a website is clearly the web page that gives it life. In fact, the two terms, website and web page, are often used interchangeably. *See id.* at 852–53, 117 S.Ct. 2329 (noting that users of the Web seek to locate "sites" but that what is found when the site is located are web pages containing "the information sought by the 'surfer' ").

{15} Not surprisingly, we have not been referred to, nor have we located, any case law that tries to distinguish between ownership of a website and ownership of the web pages that comprise the website. The few cases of any help at all, discussed below, involve disputes between web designers and the persons hiring the web designers, not dissimilar from the dispute between Collett and Defendant. Those opinions apply gener-

be commissioned for one of nine uses listed in the Copyright Act. *Id.* Because these elements are lacking in this case, the work made for hire exception to the general copyright rule does not apply. The second exception to the general rule

that the author of the work is the sole owner is that the web designer may not be the sole owner if the work was created through joint authorship. *Id.* § 201(a); Del Gallo, *supra*, at 880–81. Defendant here never claimed to be a joint author.

al copyright and contract principles to determine ownership of the copyright to the web pages, and then appear to assume, without much discussion, that ownership of the website follows from ownership of the copyright, unless otherwise agreed.

{16} The cases begin with general principles, previously discussed, that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). " 'As a general rule, the author is the party who actually creates the work, that is, the person who translates the idea into a fixed, tangible expression entitled to copyright protection.' " *Janes v. Watson,* No. SA–05–CA–0473–XR, 2006 WL 2322820, at *9 (W.D.Tex. Aug. 2, 2006) (quoting *Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

{17} In *Janes,* a fight between business partners, the partner who created the website for use by the partnership subsequently denied the partnership access to the website, claiming it as his own. *Id.* at *1–3. No contractual agreement specified the relationship between the parties. *Id.* at *12. The partner claimed that he alone had developed the website outside the scope of his employment, he had placed his name as the copyright owner on advertising materials for the website, *id.* at *11–12, and thus, he had only permitted the partnership to use the website as an implied licensee, *id.* at *1. The partnership disagreed, claiming, as alternative positions under the federal Copyright Act, that the two were either joint authors of the website or the website was a "Work for Hire" developed for the partnership within the scope of the partner's employment, and thus, the sole property of the partnership. *Id.* at *9. Summary judgment was denied due to outstanding issues of material fact. *Id.* at *12. Significantly for our purposes here, neither the court nor the parties suggested that ownership of the website was in any way distinguishable from ownership of its contents, including the copyrights. To the contrary, the partnership expressed the view that they were one and the same; namely, that it was the sole or joint author of the "website, and therefore the sole or joint own-

er of the copyrights in, to and under the . . . website." *Id.* at *11.

{18} A similar case is *Holtzbrinck Publishing Holdings, L.P. v. Vyne Communications, Inc.,* in which an independent website designer claimed website ownership even after receiving partial payment. No. 97 CIV. 1082(KTD), 2000 WL 502860, at *1–3 (S.D.N.Y. Apr. 26, 2000). The court's discussion began with a broad vision:

> As a result of the rapid growth of the Internet, many companies are creating websites to benefit their businesses, and are hiring website designers to construct the sites for them. Some of these arrangements, however, are made without either a copyright ownership or licensing clause. The resulting problem is evidenced by this case, where a relationship falters and both parties fight over the ownership of the website, and the right to use the files comprising the site. Because of the sparse case law on the subject, this case presents novel issues in the area of copyright law and its application to a website.

*Id.* at *3.

{19} Applying general principles, the court indicated that the copyright remained in the website designer, unless the hiring party could prove a conveyance in writing or that the designer was acting as the hiring party's employee for hire or as a joint author. *Id.* at *9. In the absence of such proof, the hiring party would have an implied license to use the website, but not ownership. *Id.* at *3. Significant to our own inquiry, the court used ownership of the website and the contents of the website interchangeably, stating:

> There is no dispute that [the designer] created the custom-written software for the [hiring party] Website, and that [the designer] is in the first instance the owner of the copyright in the program code. Therefore, to the extent that [the designer] owned any preliminary copyright in the Website, the copyright was never transferred to [the hiring party]. . . .
>
> The record isn't developed enough, however, to indicate whether the parties intended that [the designer's] work on the [ ] Website be considered a "Work for Hire,"

or whether the parties intended that their joint contributions to the Website be considered a "Joint Work." Thus, I cannot conclude that [the designer] is the owner of the copyright, even though it is clear that no transfer of ownership occurred. *Id.* at \*9 (citation omitted).

{20} Scholars addressing this issue come to the same conclusion that, absent a governing agreement, ownership of the website rests with ownership of the copyright. *See* Del Gallo, *supra,* at 858 (explaining that determination of who owns a website depends on who owns the "bundle of sticks represented by the copyright" and "whether any of the sticks have been given away"); Geoffrey George Gussis, *Website Development Agreements: A Guide to Planning and Drafting,* 76 Wash. U.L.Q. 721, 741 (1998) ("[T]he United States Copyright Act vests ownership, without an agreement to the contrary, in the author of the work." (quoted authority omitted)); Joshua H. Warmund, *Development Agreements are Vital to Prevent Later Disputes Over Proprietary Interests in Web Sites,* N.Y. St. B.J., Nov.-Dec.2002, at 34, 36 ("[P]roprietary interest in a web site vests through copyright transfer."). Thus, a website designer that is "the initial sole author" is also the owner. Del Gallo, *supra,* at 871. As such, the web designer enjoys all the "sticks in [the] bundle of rights that are his to enjoy as the sole owner," unless any of those "sticks" have been transferred or given away. *Id.*

{21} Applying these general principles to the case before us, the contract between Defendant and Collett clearly recognized Collett's legal ownership of the copyright to the web pages. Payment was to be the pivotal point in their legal relationship, and even then Defendant was only to receive a license to use those pages. The contract never transferred any interest in the web page design or ownership of the website to Defendant. As the owner of the copyright, Collett was the owner of the website, and any change was conditioned upon payment.

**Sufficiency of the Evidence Presented at Trial**

{22} At trial the jury was presented with evidence of Collett's ownership of the web pages and website. The Website Design Contract with its provisions regarding Collett's ownership of the copyright to the web pages was in evidence. There was testimony that under the contract Collett owned the computer programming which makes the web pages viewable, and that Collett owned the files making the web pages. Moreover, the prosecutor and defense counsel both referred to the website, not just the web pages, as Collett's. Then, Defendant changed the password, locking out Collett from the website and access to his copyrighted web pages. Based on this evidence, a rational jury could have concluded that Collett, not Defendant, owned the website and its contents, and that as set forth in the jury instructions, Defendant committed fraud by taking property that "belonged to someone other than the defendant."

**CONCLUSION**

{23} For these reasons, we affirm the Court of Appeals.

{24} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.