**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-1121**

Sprinkler Warehouse, Inc.,
Appellant,

vs.

Systematic Rain, Inc., d/b/a GPLAWN.com, et al.,
Respondents.

**Filed February 2, 2015**
**Reversed and remanded**
**Cleary, Chief Judge**

Scott County District Court
File No. 70-CV-13-3226

Clarence J. Kuhn, The Kuhn Law Firm, P.L.L.C., Edina, Minnesota (for appellant)

Bryan R. Battina, William K. Forbes, Trepanier MacGillis Battina P.A., Minneapolis, Minnesota (for respondents)

Considered and decided by Larkin, Presiding Judge; Cleary, Chief Judge; and Hudson, Judge.

## S Y L L A B U S

Under Minn. Stat. § 571.73, subd. 3 (2014) domain names and the copyright-protected material contained in websites are subject to garnishment. To effect garnishment of these types of property, a court shall compel transfer of the website and domain name to a receiver for sale and application of the proceeds against the judgment debt.

# O P I N I O N

**CLEARY**, Chief Judge

Appellant Sprinkler Warehouse, Inc. (Sprinkler) appeals from the district court's determination that a website and domain name, registered to respondent James R. Palm and used by respondent Systematic Rain, Inc., d/b/a GPLAWN.com (Systematic Rain), are not subject to garnishment under Minn. Stat. § 571.73, subd. 3. The website at issue was used by respondent Systematic Rain for its online business, and can be located at the domain name <gplawn.com>. Because websites and domain names constitute property and are subject to garnishment under Minn. Stat. § 571.73, subd. 3, we reverse and remand.

## FACTS

In 2012, Sprinkler initiated a lawsuit in Texas against Systematic Rain, alleging that Systematic Rain had infringed on Sprinkler's copyrighted material by using the material without authorization on Systematic Rain's website. At that time, both Sprinkler and respondent Systematic Rain operated online sprinkler parts distribution businesses. A default judgment was entered against Systematic Rain in Texas. A $156,000 judgment was subsequently docketed against Systematic Rain in Scott County, Minnesota.

In January 2014, Sprinkler served a garnishment summons on Palm, the chief executive officer of Systematic Rain. On Palm's garnishment disclosure forms, Palm stated that he did not have any of Systematic Rain's non-earnings property to garnish. Sprinkler filed an objection to Palm's garnishment disclosure, arguing that the website

2

and domain name were Systematic Rain's property under Palm's control and subject to garnishment. On May 7, 2014, the district court held that the website and domain name did not constitute property subject to garnishment under Minn. Stat. § 571.73, subd. 3. This appeal followed.

## ISSUES

I.      Is a registered domain name subject to garnishment?

II.     Is a website subject to garnishment?

III.    What is the appropriate procedure for garnishment of a website and domain name?

IV.     What factual determinations must be made on remand?

## ANALYSIS

The questions of whether websites and domain names are subject to garnishment under Minn. Stat. § 571.73, subd. 3 are issues of first impression in Minnesota. The application of a statute to undisputed facts is a legal conclusion, which this court reviews de novo. *Weston v. McWilliams & Assocs.*, 716 N.W.2d 634, 638 (Minn. 2006). "No deference is given to a lower court on questions of law." *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn. 2003).

Under Minnesota law, the types of property that are attachable by garnishment include:

> (2) all other nonexempt indebtedness, money, or other property due or belonging to the debtor and owing by the garnishee or in the possession or under the control of the garnishee at the time of the service of the garnishment

summons, whether or not the same has become payable. . . .

(3) all other nonexempt intangible or tangible personal property of the debtor in the possession or under the control of the garnishee at the time of service of the garnishment summons, including property of any kind due from or in the hands of an executor, administrator, personal representative, receiver, or trustee . . . .

Minn. Stat. § 571.73, subd. 3(2), (3). Minnesota cases interpreting section 571.73, subdivision 3 and its predecessor statutes have concluded that the following types of intangible property are subject to garnishment: a certificate of indebtedness given by the United States for personal services;[1] shares of corporate stock, even if not yet delivered to the shareholder;[2] state railroad bonds;[3] documents, including bearer bonds;[4] and interest of a creditor in property conveyed to trustees, the proceeds to be distributed to creditors.[5]

Because websites and domain names are conceptually distinct, we consider separately the questions of whether domain names and websites are subject to garnishment. A website is made up of all of the visual and audio elements that a person experiences while using the Internet. A domain name is the alphanumeric designation that allows a person to reach a particular website. A website and domain name can be analogized to a house and its address, for the purpose of understanding how both the website and domain name can share the same "name," but are

---

[1] *Leighton v. Heagerty*, 21 Minn. 42 (1874).
[2] *Wackerbarth v. Weisman*, 207 Minn. 507, 292 N.W. 214 (1940); *Puget Sound Nat'l Bank of Everett v. Mather*, 60 Minn. 362, 62 N.W. 396 (1895).
[3] *Banning v. Sibley*, 3 Minn. 389 (1859).
[4] *First Trust Co. of St. Paul v. Matheson*, 187 Minn. 468, 246 N.W. 1 (1932).
[5] *Nat'l Sur. Co. v. Hurley*, 130 Minn. 392, 153 N.W. 740 (1915).

4

conceptually distinct. Therefore, although the district court applied the same analysis to both websites and domain names, we analyze them separately here.

We note that the district court did not decide whether the domain name or website were property "belonging to the debtor" Systematic Rain, as required by Minn. Stat. § 571.73, subd. 3(2), (3). The district court did not have the benefit of a fully developed record as to ownership at the hearing, nor did the court make specific findings as to ownership in its order. The court treated the question of ownership as the second of two steps of its garnishment analysis, to be determined only after the court determined whether a domain name and website could be garnished. As a result, the court only considered the issue of "whether or not the domain name 'GPLAWN.com' and the related website are property that is subject to garnishment." Accordingly, we review here only the court's conclusion that domain names and websites are not property subject to garnishment under Minn. Stat. § 571.73, subd. 3(2), (3). It is left to the district court to make findings as to ownership of the domain name and website.

## I.

Sprinkler argues that the district court erred by determining that domain names are not subject to garnishment under Minn. Stat. § 571.73, subd. 3. The following sections discuss the nature and function of domain names, whether domain names constitute property, and the application of Minn. Stat. § 571.73, subd. 3 to domain names.

5

### A. Domain Names

A domain name is part of the alphanumeric address used to reach a website. The full address used to reach a website is its uniform resource locator (URL). Steven Blackerby, *Flat Broke and Busted, but Can I Keep My Domain Name? Domain Name Property Interests in the First, Fifth, and Eleventh Circuits*, 11 J. Intell. Prop. L. 117, 121 (Fall 2003). A URL is made up of (1) a scheme or transfer protocol (usually "http://") and (2) a domain name. *Id.* The "top level" domain is the last part of the domain name, such as .com, .gov, .edu, .org, or .net. *Id.* at 122. The "second level" domain precedes the top level domain in the address, and is the individual identifier for each website. *Id.* at 121-22.

Each domain name corresponds to a specific numeric address called the "Internet protocol (IP) address." *Id.* at 121. IP addresses contain the true information that networked computers use to locate specific websites, because each IP address corresponds to a specific server storing the information that will be displayed on the website. *Id.* The additional step of using domain names is for the convenience of users, for whom names and words are more memorable and meaningful than numeric IP addresses. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 952 (C.D. Cal. 1997).

Second-level domain names are unique and exclusionary, in that only one entity can register and use a specific second-level domain name at any given time. Blackerby, *supra*, at 122. Additionally, most domain names are available on a first-come, first-served basis. Internet Corporation for Assigned Names and Numbers,

*Beginner's Guide to Domain Names* 3-4 (2010). These attributes of domain names have led to a lucrative market in buying and selling the rights to use "certain generic or clever domain names that do not violate a trademark or other right or interest, but are otherwise extremely valuable to Internet entrepreneurs." *Dorer v. Arel*, 60 F. Supp. 2d 558, 561 (E.D. Va. 1999).

Domain names must be registered for a period of years with accredited registrars. *Beginner's Guide*, *supra*, at 3-4. The domain name registration process involves a contract between the registrar and the registering individual or business. *Id.* at 6. This contract "sets forth the terms under which [the] registration is accepted and will be maintained." *Id.* Registrants pay for domain name registration services which include, at a minimum, ensuring that a particular domain name is available and linking the registered domain name to its IP-numbered server. Blackerby, *supra*, at 125-26. In return, the registrant obtains the exclusive right to use the domain name for the registration term. *Beginner's Guide*, *supra*, at 7. It is possible, however, to change the name on the registration record. *Id.* at 12. Some registrars charge for this process, and the new registrant must establish an account with the registrar. *Id.*

The right to use a specific domain name may end involuntarily. Registrants are contractually bound by certain obligations, a violation of which may result in termination of the domain name registration. *Id.* at 8-9. Also, domain name registrations are not automatically renewed at the end of a registration period (although some registrars offer an automatic renewal service). *Id.* at 9. On the other hand, a registrant retains the exclusive use of that domain name as long as the registrant

chooses to renew the registration. *Id.* A registrant may even transfer registration of a domain name to a different registrar at the time of renewal, without losing the continuous and exclusive right to use the same domain name. *Id.*

### B. Do Domain Names Constitute Property?

Based on the above description of domain names, we conclude that domain names do constitute property. In an unpublished decision, this court has previously considered a company's domain name to be an "asset[] with measurable value." *Schwartz v. Virtucom, Inc.*, No. A08-1059, 2009 WL 1311816, at *4 (Minn. App. May 12, 2009). Other jurisdictions discussing the question of whether domain names are property have either concluded that they are property, or have declined to dispute the characterization of domain names as property.[6] *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003), which discusses this question thoroughly, held that a domain name is property for the purposes of protection from conversion, because domain names are well-defined interests, the rights to use domain names (as opposed to the domain names themselves) are valued, bought, and sold, and domain name registrants "have a legitimate claim to exclusivity." *Id.* at 1029-30. Additionally, some domain names may constitute intellectual property, as visitors to the website begin to associate the domain name with the entity whose website is connected to that domain name. *Dorer*,

---

[6] *See Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 702 (9th Cir. 2010) (holding that domain names are intangible property under California law); *Network Solutions, Inc. v. Umbro Int'l, Inc.*, 529 S.E.2d 80, 86 (Va. 2000) (declining to dispute the characterization as a property right, but concluding that its character as property was not dispositive of whether it could be garnished); *In re Larry Koenig & Assoc. LLC*, No. 01-12829, 2004 WL 3244582, at *6 (Bankr. M.D. La. Mar. 31, 2004) (discussing the value of domain names).

60 F. Supp. 2d at 561. Domain names may also be registered trademarks and as such are treated as property under the U.S. Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125. Each of these authorities supports our conclusion that domain names are property.

### C.    Application of Minn. Stat. § 571.73

However, whether a domain name is "property" is not dispositive of whether domain names are property *subject to garnishment* under Minn. Stat. § 571.73. In our interpretation and construction of statutes, we attempt to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). The threshold determination in discerning the intent of the legislature is whether the statutory language is ambiguous. *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn. 2010). When the statutory language is unambiguous, further construction of the statute is neither necessary nor permitted. *State v. Jesmer*, 293 Minn. 442, 442, 196 N.W.2d 924, 924 (1972).

The words of the garnishment statute are clear and unambiguous. Minn. Stat. § 571.73, subd. 3 states that property subject to garnishment includes "all" nonexempt property, whether intangible or tangible, of "any kind." Such wording indicates that the legislature intended the category of property subject to garnishment to be as broad and inclusive as possible. We surmise that the legislature intended this broad language to encompass any valuable real or intangible property, even types of property that were yet to be developed. There is no ambiguity in the phrase "all property" to warrant further statutory construction.

The Ninth Circuit followed a similar approach to statutory interpretation in *Zuccarini*. *Zuccarini* considered whether California law allowed the garnishment of 190 of the judgment debtor's 248 registered domain names. 596 F.3d at 698. Similarly to Minn. Stat. § 571.73, subd. 3, the California statute governing garnishment allows garnishment of "*all* property of the judgment debtor." Cal. Civ. Proc. Code § 695.010 (West 2014) (emphasis added). After concluding that domain names are property, the *Zuccarini* court concluded that domain names are subject to garnishment under the clear language of the garnishment statute. *Zuccarini*, 596 F.3d at 702. Likewise, we hold that domain names are subject to garnishment under Minn. Stat. § 571.73, subd. 3.

In the district court's decision not to allow garnishment of domain names, the district court relied upon *Umbro* which held that domain names are not subject to garnishment under Virginia law. 529 S.E.2d at 88. The *Umbro* court held that domain name registration creates a contract for services, but did not decide the question of whether a domain name is also property. *Id.* at 86 (stating that it was not "essential to the outcome of this case to decide whether the circuit court correctly characterized a domain name" as property). Rather than analyzing whether the Virginia garnishment statute was ambiguous in its application to domain names, *Umbro* concluded that domain names could not be garnished because contracts for services were not subject to garnishment under Virginia law. *Id.* In contrast to the *Umbro* court, we hold here that a domain name is a form of property and we conclude that, despite the fact that a domain name may be categorized both as property and as a contract for services, a

10

domain name nevertheless qualifies as property subject to garnishment under Minn. Stat. § 571.73.

## II.

Sprinkler also argues that the district court erred by determining that websites are not subject to garnishment under Minn. Stat. § 571.73. The following sections discuss the nature and definition of a website, whether and to what extent a website constitutes property, and the application of Minn. Stat. § 571.73 to websites.

### A.  Websites

A website is "a set of interconnected webpages, prepared and maintained as a collection of information." *State v. Kirby*, 141 P.3d 838, 840 (N.M. 2007). Structurally, a website consists of content and software to assemble that content.[7] Warren Agin, *Bankruptcy and Secured Lending in Cyberspace* § 1:14 (2014). Each webpage displayed as part of a website is made up of a source document and the multimedia content to be displayed on the webpage. Preston Gralla, *How the Internet Works* 137, 151 (8th ed. 2007). The source document employs hypertext markup language (HTML), or some other markup language, to instruct the Internet browser how to retrieve, format, and display multimedia content. *Id*. This multimedia content is stored in separate files from the source document. *Id*. The markup language in the source document references these separate multimedia files and renders the content

---

[7] A website does not include the customer information collected from a website's interactive features. Such customer lists are a separate asset of the business, distinct from the website itself. The question of whether customer lists may be garnished under Minn. Stat. § 571.73 is not before this court.

11

onto the webpage. *Id.* The markup language also incorporates "scripts" into the source document. Elizabeth Castro, *HTML for the World Wide Web* 291 (4th ed. 2000). Scripts are small software programs that operate the interactive elements on websites, including online-purchasing functions, a shopping-cart function, site-searching functions, blog and comment functions, translation and calculation functions, and various forms that allow website visitors to leave contact information, make referrals, or sign up for communications. *Id.*

### B. Do Websites Constitute Property?

The elements that make up a website—the source documents, multimedia content, and the scripts that operate interactive website features—constitute property to the extent that they are copyright-protected material. Copyright protection applies to "original works of authorship fixed in any tangible medium of expression" and arises as of the moment the author affixes his or her work to the medium of expression. 17 U.S.C. § 102. Online publication is a "tangible medium" for purposes of copyright protection. U.S. Copyright Office, *Circular 66*: *Copyright Registration for Online Works* 1 (2012). "For works transmitted online, the copyrightable authorship may consist of text, artwork, music, audiovisual material (including any sounds), sound recordings, etc." *Id.* Thus, websites often consist of a collection of copyright-protected material.

A website itself may also be copyright protected, if the website's arrangement constitutes an original work of authorship. "Copyright protection for a website may extend to both the screen displays and the computer code for the website." *Integrative*

12

*Nutrition, Inc. v. Acad. of Healing Nutrition,* 476 F. Supp. 2d 291, 296 (S.D.N.Y. 2007).  The U.S. Copyright Office may, however, choose to deny an application to copyright an entire website if, viewing the website as a whole, the elements "lack[] even a minimal degree of creativity."  *Darden v. Peters*, 402 F. Supp. 2d 638, 643 (E.D.N.C. 2005), *aff'd*, 488 F.3d 277 (4th Cir. 2007).  Any material that has been previously registered, has been previously published, or is in the public domain cannot be copyrighted.  *Copyright Registration for Online Works*, *supra*, at 1.

Copyrights have the attributes of personal property, including the owner's "right to exclude others from using his property."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392, 126 S. Ct. 1837, 1840 (2006) (quotations omitted).  The copyright in a work initially vests ownership of the work in the author.  U.S. Copyright Office, *Circular 1: Copyright Basics* 2 (2012).  For a website, the owner is either the person or group that actually designed the website, or the hiring party, where an outside party has been hired to design the website.  Rinaldo Del Gallo, III, *Who Owns the Web Site?: The Ultimate Question When a Hiring Party Has a Falling-Out with the Web Site Designer*, 16 J. Marshall J. Computer & Info. L. 857, 870 (1998).  Copyrights are alienable and may be transferred "in whole or in part by any means of conveyance or by operation of law."  17 U.S.C. § 201(d)(1).  We conclude that any unique, copyright-protected portions of a website constitute property.

It is important to note that not all parts of a website are necessarily property of the website owner.  Some portions of the website may not be unique enough to merit copyright protection, and are merely in the public domain.  *Darden*, 402 F. Supp. 2d at

643. Also, some portions of a website may actually belong to a third party and may merely be licensed to the website owner for use on the website. Scott W. Pink, *The Internet & E-Commerce Legal Handbook* 137 (2001). Only the copyright-protected portions of a website that belong to the judgment debtor can be considered the judgment debtor's property for the purpose of Minn. Stat. § 571.73.

### C. Application of Minn. Stat. § 571.73

The Supreme Court case *Ager v. Murray* is generally cited for the proposition that intellectual property, including patents and copyrights, is "subjected by suitable judicial proceedings to the payments of [the judgment debtor's] debts." 105 U.S. 126, 128 (1881). *Ager* also provides that the appropriate method for a judgment creditor to obtain intellectual property is for the trial court to compel the judgment debtor to make a written assignment of the copyright or patent to a receiver to sell it, the proceeds to be applied against the judgment. *Id.* at 131; *see also Stephens v. Cady*, 55 U.S. 528, 531 (1852) (approving of the court compelling the transfer and sale of a copyright in order to apply the proceeds to the payment of a judgment debt).

Even if federal law authorizes the sale of intellectual property to satisfy debts, the issue before this court is whether Minnesota law includes copyrights as property subject to garnishment. No published cases in Minnesota have considered whether websites specifically, or copyright-protected materials generally, are subject to garnishment under Minn. Stat. § 571.73. One Minnesota case, *P.H. & F.M. Roots Co. v. Decker*, indicates that intellectual property may be sold and applied against judgment debts. 111 Minn. 458, 461-62, 127 N.W. 417, 418-19 (1910) (stating in a

14

creditor's bill suit that a court can deprive an individual of patent rights for the purpose of satisfying a judgment debt, but only if the court has personal jurisdiction over the patent-holder).

As with domain names, the wording of Minn. Stat. § 571.73, subd. 3 indicates that the legislature intended Minn. Stat. § 571.73, subd. 3 to include copyright-protected material. The statute unambiguously applies to "all property." Because we conclude that the copyright-protected material that comprises a website constitutes property, we hold that such material is subject to garnishment under Minn. Stat. § 571.73, subd. 3.

## III.

We also address here the appropriate procedure through which a domain name and the copyright-protected portions of a website may be garnished. The purpose of the garnishment statute is to allow judgment creditors to recover money in satisfaction of the judgment debt. *See* Minn. Stat. § 571.73. The procedure to garnish a domain name and website should promote that purpose. The creditor, Sprinkler, originally requested that the district court order Palm, the garnishee, to assign the domain name and website to Sprinkler, but Sprinkler did not indicate how or when it would apply the value of the domain name and website against Systematic Rain's judgment debt. Like the district court, we are concerned that such an arrangement would create the potential for judgment creditors to misuse the garnishment statute.

A more appropriate method for a judgment creditor to reach the value of a website and domain name is for the court to compel the garnishee to transfer the

15

website and domain name to a receiver for sale. *Ager* holds that intellectual property cannot be reached by execution, and prescribes transfer to and sale by a receiver as the appropriate method for a judgment creditor to reach the value of intellectual property. 105 U.S. at 131. Minnesota precedent approves of this method for a creditor to reach the value of a debtor's intellectual property. *See Decker*, 111 Minn. at 461-62, 127 N.W. at 418-19 (citing in part to *Ager* to conclude that a court could order the judgment debtor to transfer a patent right, if the court had personal jurisdiction over the judgment debtor). The sale by a receiver allows the value of the website and domain name to be applied against the judgment debt, while eliminating the temptation for judgment creditors to misuse the garnishment statute. We hold that a judgment creditor may reach the value of a domain name and of copyright-protected property in a website by requesting that the district court appoint a receiver and compel the garnishee to transfer ownership of the property to the receiver for sale. The receiver shall sell the website as a whole, subject to any nontransferable licenses, for its intellectual-property value.

**IV.**

Before the website and domain name can be transferred, several factual determinations remain to be made regarding the ownership and control of the website and domain name. In its memorandum in support of the order, the district court specifically stated that "[t]he sole issue is whether or not the domain name 'GPLAWN.com' and the related website constitute property that is subject to garnishment." The district court never decided (1) whether Systematic Rain was the

16

owner of the property at issue, (2) whether Palm was the proper garnishee by virtue of his possession or control of the website and domain name, or (3) whether Systematic Rain had made any fraudulent transfers of the website and domain name. Each of these findings is a necessary prerequisite to garnishment under Minn. Stat. § 571.73.

A final determination that must be made on remand is whether there are portions of the website that cannot be garnished. A website may include licensed property that belongs to third parties rather than to the judgment debtor. The district court should review such licenses to determine whether they can be transferred, assigned, or sold along with the website. This factual determination should expedite the application of the proceeds to the judgment debt by clarifying which parts of the website will not be included in the sale of the website.

The district court should allow for development of the record and hold a hearing regarding the factual determinations described above. If the district court finds that Palm is the proper garnishee of the website and domain name owned by Systematic Rain, the district court shall direct Palm to transfer the domain name and the website to a receiver for sale and application against Systematic Rain's judgment debt.

## D E C I S I O N

Minn. Stat. § 571.73, subd. 3 is unambiguous and applies to all property. Both domain names and the copyright-protected material in websites constitute property. Therefore, domain names and websites are subject to garnishment under Minn. Stat. § 571.73, subd. 3. Sprinkler may garnish the domain name and any copyright-

17

protected portions of the website that are owned by Systematic Rain.  We reverse and remand.

**Reversed and remanded.**